The ROBERT A. WELCH FOUNDA·
TION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 14458.

United States District Court
S. D. Texas,
Houston Division.

May 23, 1963.

Baker, Botts, Shepherd & Coates, Homer L. Bruce and Robert J. Piro, Houston, for plaintiff.

Woodrow Seals, U. S. Atty., and John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., and Arthur L. Biggins, Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant.

INGRAHAM, District Judge.

This cause came on to be heard on the motion of the plaintiff for a summary judgment and the motion of the defendant for a summary judgment, and the court, having considered said motions, the affidavits and depositions of Daniel R. Bullard, Robert E. Wise and Homer L. Bruce therein referred to, the pleadings, the admissions on file in this cause, and the briefs of counsel for plaintiff and defendant, makes the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. This cause arises under the provisions of the Internal Revenue Code of 1954. In it plaintiff, a trust created under the will and codicils thereto of Robert A. Welch of Houston, Texas, deceased, herein sometimes referred to as the Foundation, seeks the recovery from the defendant of income taxes for the taxable years ended August 31, 1955 and 1956, and interest thereon that were paid by the plaintiff to the defendant and which the plaintiff claims were erroneously collected from it by the defendant.

2. The sole question in this case is whether certain income received by plaintiff for the years involved was subject to the Federal income tax under the provi-

sions of Section 511 to 513 of that Code dealing with unrelated business taxable income of organizations otherwise exempt under Section 501(a) and (c) (3).

3. Welch died December 27, 1952, and left a will dated March 19, 1948, and three codicils thereto dated July 29, 1949, January 6, 1950 and December 22, 1951, which were duly admitted to probate on January 20, 1953, in the County Court of Harris County, Texas, in probate.

4. The will and codicils, after minor bequests, left an amount equal to 15% of the value of the net estate, as finally determined for Federal estate tax purposes, to 29 different employees of the testator or of Mound Company and Fidelity Oil & Royalty Company, the employees' shares of the 15% ranging from 25% down to 1/10th of 1%. The remainder of the estate was left to Daniel R. Bullard, Clarence M. Malone, Wilfred T. Doherty and P. George Maercky as trustees with the trust to be known as The Houston Foundation, which name was later changed to the present one of The Robert A. Welch Foundation, plaintiff herein. Bullard, Malone and Doherty duly qualified as trustees, but, after Maercky declined to act as a trustee, Jesse Andrews was named in his place as trustee. Malone and Andrews have since died and the present trustees are Bullar, Doherty, Lester Settegast and Roger J. Wolfe.

5. As will appear from the provisions of the will and codicil, plaintiff was from its creation and at all times since then such an organization as was and is exempted from the Federal income taxes under the provisions of Section 501(a) and (c) (3) of the 1954 Internal Revenue Code. The Commissioner of Internal Revenue by letter of June 30, 1958, addressed to the plaintiff by J. F. Worley, Chief, Exempt Organizations Branch, ruled that it was so exempt.

6. Bullard, Malone and Doherty were named, and qualified, as independent executors of the estate.

7. During Welch's lifetime he generally operated in the oil business with the Mound Company (organized in 1905) and Fidelity Oil & Royalty Company (organized in 1930), and in most instances the three of them would own undivided interests in the same properties. Welch and his estate owned in Mound 2,010 shares of common stock and 1,390 shares of preferred stock out of its total outstanding of 2,558 common and 1,942 preferred, the balance being owned by 42 other stockholders. He and his estate owned 450 shares of common stock in Fidelity, with the other 150 shares being owned by three others, known as the Heyer group, who were entirely different from the plaintiff and the 15% legatees hereinafter referred to. From shortly after Welch's death the persons who were his executors and the trustees of the plaintiff have been a majority of the directors of Mound and Fidelity, Doherty being President of Mound and Vice-President of Fidelity and Bullard being President of Fidelity and Vice-President of Mound.

8. By Article IV-A of the will as added by the codicil of December 22, 1951, Welch, as stated above, left in substance 15% of his net estate to 29 individuals, whose interests therein ran from 25% down to 1/10th of 1%. Stated another way, their interest in the net estate ran from 3¾% down to a 15/100,000ths or 3/20,000ths. These are herein referred to for convenience as the 15% legatees.

9. On the basis of the final determination of the federal estate tax the estate consisted of the following:

| | |
|---|---|
| Stocks and bond | $19,053,354.09 |
| Oil and gas interests and other working interests | 6,295,622.88 |
| Fee properties, mineral fee properties, royalty interests | 1,647,115.63 |
| Other assets | 1,575,489.75 |
| | $28,571,582.35 |

10. The estate and the 15% legatees agreed upon a division in kind of the properties of the estate, an undivided 85% going to the plaintiff and an undivided 15% to the 15% legatees. As to stocks, bonds and properties other than

the oil and gas properties this was comparatively easy, but as to the oil and gas properties this presented many problems. It was impracticable or unworkable to distribute those properties in undivided interests to the plaintiff and these 29 individuals. As to producing properties it would be very burdensome to have the plaintiff and 29 individuals as the owners as each and every one of them would have to be consulted as to every step of the operations. The same was true as to non-producing mineral interests. All of the 29 would have to be consulted on any deal or program that might come up for consideration. On the other hand, if all of these interests were converted into a net profits overriding royalty, these difficulties would be eliminated as the plaintiff and the 29 15% legatees would not have to be consulted at all in reference to their operation. These were some of the considerations that led the executors and trustees to make the overriding royalty agreement of June 1, 1953, with Fidelity hereinafter discussed. This agreement is generally referred to as Contract No. 1.

11. Another reason that led the executors and trustees to make that Contract No. 1 was the inherent risk involved in oil and gas drilling, development and operation. According to the final estate valuation these oil and gas properties came to $7,942,738.51 out of a total estate of $28,571,582.35 or approximately 28% of the total estate. The executors and trustees, as fiduciaries, were unwilling to subject the other assets of the estate to these possible liabilities arising from oil operations which could be avoided if these mineral interests were converted into a net profits overriding royalty.

12. Another factor that led the Executors and Trustees to make that Contract No. 1 was the above mentioned Sections 511 to 513 of the Internal Revenue Code. The Foundation's attorneys advised it that, if it continued to own leases or working interests in oil and gas properties and itself produced oil or gas, its income therefrom would be unrelated business taxable income under the provisions of Sections 511 to 513 and would be subject to the Federal income taxes. Its attorneys further advised that, if these mineral interests were transferred to Fidelity and the Foundation reserved an overriding royalty in the form set out in said Contract No. 1, the income of the Foundation from such an overriding royalty would not be unrelated business taxable income within the provisions of the said Sections 511 to 513 and would not be income subject to the Federal income tax.

13. As a result of these considerations it was decided to make the Contract No. 1 of June 1, 1953, with Fidelity. This arrangement was entirely agreeable to Fidelity as Fidelity could then operate, manage and deal with the properties without the necessity of consulting with the plaintiff or any of the 15% legatees, Fidelity merely accounting to them for their percentage of the net profits applicable to their interest in the properties.

14. Accordingly the executors and trustees by instruments dated June 1, 1953, conveyed all of these oil and gas properties to Fidelity and reserved an overriding royalty as set forth in detail in the said Contract No. 1 between the executors and the trustees and Fidelity.

15. In substance the Foundation reserved a royalty equal to 100% of the net profits realized by Fidelity from the oil, gas and other minerals produced from the mineral interests conveyed to it. The first paragraph of Section 3 of Contract No. 1 reads:

"Section 3. The reserved royalty interests are and shall be an overriding royalty or a royalty, as the case may be, equivalent to all (100%) of the net profits realized by Fidelity from oil, gas and other minerals produced, saved and marketed from the leased premises and attributable to the conveyed interests."

The contract then provided for the purpose of determining the net profits for Fidelity to set up an account. The Foundation would be credited in the account with the gross proceeds received by Fidelity from the sale of oil, gas and other minerals produced from the interests sub-

ject to Contract No. 1, and would be charged with the corresponding part of all expenditures incurred by Fidelity in connection with said interests. Fidelity was required to pay to the Foundation and the 15% legatees each month any net amount to their credit in the account at the end of the preceding month, except that Fidelity was authorized to build up and maintain a reserve of $50,000. These provisions concerning the accounting were set forth in Section 3 of said contract. There was no personal liability of the Foundation to pay Fidelity any part of the latter's expenditures, Fidelity being required to look only to the income for reimbursement, Section 4 of the contract providing as follows:

"Section 4. The provisions of Section 3 hereof and the account provided for therein are for the sole purpose of providing a measure for determining the reserved royalty interest of Foundation, and in no event shall Foundation be liable or responsible in any way for any costs, expenses or liabilities incurred by Fidelity in developing, operating and maintaining the leased premises or in storing, handling, treating or marketing the production therefrom, nor shall Foundation be liable or responsible, by way of reimbursement or otherwise, for any overpayments at any time made by Fidelity, such overpayments, if any, to be recovered by Fidelity solely out of production or proceeds from production thereafter obtained from the leased premises by proper charge to the account provided for in Section 3 hereof or from the reserve maintained under subdivision (g) under the caption 'Charges' in said Section 3."

16. After Contract No. 1 was executed, the estate conveyed to the 15% legatees their proportionate parts of this overriding royalty.

17. After the death of Welch in December, 1952, down to March 1, 1954, the estate acquired out of its own funds additional oil and gas mineral interests but the 15% legatees had no interest in them as they had not been owned by Welch in his lifetime. On March 1, 1954, none of those mineral interests were producing. For the same considerations that the executors and trustees made the agreement as set out in Contract No. 1 (except that the 15% legatees were not involved in these properties), the executors and trustees transferred these additional properties to Fidelity and made Contract No. 2 dated March 1, 1954, with Fidelity under which the estate reserved the same kind of overriding royalty. The two contracts, except for necessary changes in reference to the properties described, are practically identical word for word. For example, the first paragraph of Section 3 and all of Section 4 of Contract No. 1 set out above are identical with the first paragraph of Section 3 and Section 4 of Contract No. 2. There was only one variation from the Contract No. 1 and that is set out in Sections 18 and 19 of Contract No. 2. That Section 18 recited that at the date of the agreement there was no production from the leases covered thereby. In other words it was not known whether the properties would produce or not. Fidelity was unwilling to incur the whole risk of drilling exploratory wells. However, the plaintiff was interested in having those properties tested. Accordingly it was provided in Section 18 that, until such time as the production from the leases should be sufficient to reimburse Fidelity for costs incurred in the drilling of exploratory wells, the plaintiff would pay to Fidelity the Foundation's proportionate part of the costs incurred by Fidelity in the drilling of each exploratory well on the property subject to Contract No. 2 which might be completed as a dry hole, and its proportion of any such costs incurred by Fidelity that might not be recovered by Fidelity from the production in an exploratory well which might be completed as a producer but which ceased to produce.

Section 19 provided that, if the plaintiff and Fidelity thereafter acquired undivided interests in leases and lands, the plaintiff should have the right to convey

its interest in them to Fidelity under the same terms as this Contract No. 2.

18. As stated above, the estate owned 450 shares of stock in Fidelity and the other 150 shares were owned by the Heyer group, the estate having a 75% interest and the Heyer group a 25% interest. On September 1, 1954, the executors turned over the oil and mineral properties and assets of the estate to the plaintiff.

19. The Heyer group desired to dissolve Fidelity and take for their quarter interest in the stock an undivided one-fourth interest in all of Fidelity's properties that were not subject to Contracts Nos. 1 and 2. This was agreeable to the plaintiff but there came into play the same considerations about having mineral interests owned directly by the plaintiff and the 15% legatees, the latter of course owning their 15% interest in the stock of Fidelity and being entitled to their 15% of any distributions of Fidelity. Accordingly it was agreed among all of the parties that Fidelity would transfer to Mound subject to Contracts Nos. 1 and 2 the properties that were subject to those contracts, and would first transfer to Mound an undivided 75% in all of its other properties and execute with Mound an overriding royalty agreement substantially similar in all respects to that of Contract No. 1 and then distribute this overriding royalty interest to the plaintiff and 15% legatees. Accordingly Fidelity made the necessary transfers to Mound of the properties subject to Contracts Nos. 1 and 2 and of the 75% interest in its other properties, executed with Mound Contract No. 3, and then dissolved and distributed the overriding royalty under Contract No. 3 to plaintiff and the 15% legatees and the remaining 25% interest in its other properties to the Heyer group. Contract No. 3 was dated August 31, 1955, and was between Fidelity and Mound under which Fidelity reserved the same type of overriding royalty as was reserved in Contract No. 1. This Contract No. 3 was substantially the same as Contract No. 1 except for the necessary changes in parties, dates and descriptions of properties. For example, the first paragraph of Section 3 and all of Section 4 of Contract No. 1 set out above are identical with the first paragraph of Section 3 and Section 4 of Contract No. 3.

20. Under Section 7 of each of said Contracts Nos. 1, 2 and 3, if Fidelity under Contracts Nos. 1 and 2 or Mound under Contract No. 3 acquired any oil, gas or mineral interests (except landowner's royalty) in any land situated in the vicinity of any properties subject to those contracts, the plaintiff had the right to participate in such acquisition if it desired. If plaintiff participated in any such purchase, its interest became subject to the corresponding royalty contract and its pro rata cost of such acquisition was entered as a charge on the account between plaintiff and Fidelity or Mound, as the case might be, referred to above.

21. During the fiscal year from September 1, 1954, to August 31, 1955, plaintiff received income from the royalties on oil and gas that it reserved in said Contracts Nos. 1 and 2, and during the fiscal year from September 1, 1955, to August 31, 1956, plaintiff received income from the royalties on oil and gas that it held under said Contracts Nos. 1, 2 and 3. The Commissioner of Internal Revenue, however, held that said interests held by plaintiff were not royalties but were working interests and that such income was unrelated business taxable income, and on that income the Commissioner of Internal Revenue assessed against the plaintiff $43,245.49 of income taxes for the fiscal year ended August 31, 1955, and interest thereon of $13,339.16, and $242,360.67 of income taxes for the fiscal year ended August 31, 1956, and interest thereon of $60,214.51.

22. On or about January 10, 1962, plaintiff paid said $43,245.49 and $242,-360.67 of income taxes and said amounts of interest thereon of $13,339.16 and $60,214.51 to the District Director of Internal Revenue for the Austin, Texas, District.

23. On or about July 2, 1962, within less than two years after the date on

which plaintiff made said overpayment of taxes and interest plaintiff filed with the United States District Director of Internal Revenue for the Austin District of Texas its claims for the refund to it of said taxes and interest, all in accordance with the laws of the United States and the rules and regulations prescribed by the Commissioner of Internal Revenue and the Secretary of the Treasury. In said claims for refund plaintiff claimed that said taxes and interest should be refunded to it on the same grounds and for the same reasons as are set forth in its complaint in this cause as the grounds and reasons upon which it should recover said taxes and interest from the defendant. On or about July 18, 1962, the Commissioner of Internal Revenue, acting through the District Director of Internal Revenue for the Austin District of Texas, mailed by certified mail to plaintiff notice of the disallowance by him of said claims for refund.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter of, and parties to, this cause.

2. During all the times material to this cause the plaintiff has been such an organization as is exempted from the Federal income taxes under Section 501 (a) and (c) (3) of the Internal Revenue Code.

3. Sections 511 to 513 of the Code provide that, if such an organization is engaged in an unrelated trade or business, as defined by Section 513, its income from such business shall be unrelated business taxable income and it will be subject to the Federal income tax on that income. These provisions were first enacted in substantially similar form by Section 301 of the Internal Revenue Act of 1950 as Sections 421 and 422 of the Internal Revenue Code of 1939.

4. Section 512(b) of the Internal Revenue Code provides in part as follows:

"(b) Exceptions, additions, and limitations.—The exceptions, additions, and limitations applicable in determining unrelated business taxable income are the following:

"(1) There shall be excluded all dividends, interest, and annuities, and all deductions directly connected with such income.

"(2) There shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income."

This Section 512(b) was originally included in Section 422 of the 1939 Code as added thereto by the Revenue Act of 1950. However, these subparagraphs (1) and (2) as originally included in the House version of the 1950 Act read:

"(1) There shall be included all dividends, interest, annuities, and royalties, and all deductions directly connected with such income."

The House Ways and Means Committee in its report on the 1950 bill stated (1950-2 C.B. 409):

"The tax applied to unrelated business income does not apply to dividends, interest, royalties (including, of course, overriding royalties), rents (other than certain rents on property acquired with borrowed funds), and gains from sales of leased property."

This subparagraph (1) of the House version was changed by the Senate to read as follows:

"(1) There shall be excluded all dividends, interest, and annuities, and all deductions directly connected with such income.

"(2) There shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or net income from the property, and all deductions directly connected with such income."

The Revenue Act of 1950 adopted this version as written by the Senate, and these provisions were carried forward into Section 512(b) (1) and (2) of the Internal Revenue Code of 1954.

■ 5. An overriding royalty on oil and gas properties, such as were held by the plaintiff under said Contracts Nos. 1, 2 and 3, are entirely different from working interests owned by the holder of an interest in an oil and gas lease who drills the wells and operates the properties for the production of oil and gas. The owner of such a working interest is actively engaged in his operations at all times and such operations under a working interest are definitely the carrying on of a trade or business. This is so clear that citation of authorities is unnecessary. On the other hand the owner of an overriding royalty such as was held by the plaintiff is not engaged in any operations for the production of oil or gas. All of the operations in this case by which the oil and gas on account of which the plaintiff received its royalty income were carried on by Fidelity Oil & Royalty Company and later by the Mound Company. As stated by the Circuit Court of Appeals for the Fifth Circuit in Snell v. Commissioner of Internal Revenue, 97 F.2d 891, in speaking of the meaning of "business":

> "The word, notwithstanding disguise and spelling and pronunciation, means business; it implies that one is kept more or less busy, that the activity is an occupation."

The plaintiff through its ownership of these overriding royalties was not kept busy in the sense of operating a business. Consequently, the plaintiff was not through the ownership of these overriding royalties engaged in such a business as comes within the meaning of unrelated trade or business as defined by Section 513 of the Internal Revenue Code and consequently it would not be subject to the tax on unrelated business taxable income.

■ 6. In addition Section 512(b) (2) specifically excludes from the term "unrelated business taxable income" all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property. The overriding royalties held by plaintiff under Contracts Nos. 1, 2 and 3 were clearly overriding royalties that were excepted under Section 512(b) (2) from the term "unrelated business taxable income" and consequently plaintiff's income from those royalties was exempted from the Federal income tax on unrelated business taxable income.

■ 7. There were valid business reasons for plaintiff to have this arrangement to transfer its working interest properties to Fidelity and to have these overriding royalty contracts for the reasons set forth in the findings of fact above. Even though one of the reasons that actuated the plaintiff in transferring its properties to Fidelity and having these overriding royalties was to relieve itself from the tax on unrelated business income as provided for in Sections 511 to 513, this does not defeat what was actually done and does not cause this income to be subject to the Federal income tax. The Supreme Court in Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, stated:

> "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506 [21 L.Ed. 728]; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395–396, [50 S.Ct. 169, 74 L.Ed. 504]; Jones v. Helvering, 63 App.D.C. 204, 71 F. (2d) 214, 217."

This rule has been reiterated by the courts many times as, for example, by the Court of Appeals for the Fifth Circuit in Sun Properties, Inc. v. United States, 220 F.2d 171, 174:

> "And we said in Montgomery v. Thomas [5 Cir.], 146 F.2d 76, 81:
>
>> " 'The general rule is in accord with that expressed in Johnson v. Commissioner of Internal Revenue, 2 Cir., 86 F.2d 710: "Legal transactions cannot be upset merely because parties have entered into them for purpose of minimiz-

888

ing or avoiding taxes which might otherwise accrue." ' "

8. The plaintiff is entitled to recover of and from the defendant the overpayment of income taxes and interest thereon in the amounts set forth in its complaint with interest thereon at the rate of 6% per annum from the date such amounts were paid by it to the defendant as set forth in its complaint.

9. Plaintiff is entitled to recover of and from the defendant all costs in this cause allowed by law.